**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

ERIC MATTHEW GAUTREAU,      :

         Plaintiff,      :

v.      :      **Civil Action No. 2:15cv81**

CAROLYN W. COLVIN,      :
Acting Commissioner of      :
Social Security,      :

         Defendant.      :

## <u>MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION</u>

Plaintiff Eric Matthew Gautreau ("Gautreau") seeks judicial review of the decision of the Commissioner of Social Security Administration ("Commissioner") denying his claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. Specifically, Gautreau claims that the Administrative Law Judge ("ALJ")'s residual functional capacity ("RFC") failed to account for the effects of his mental impairments; the ALJ asked the vocational expert ("VE") hypothetical questions that did not account for these limitations; and the ALJ relied on testimony that did not comport with the Dictionary of Occupational Titles ("DOT") without adequate explanation of these differences. (ECF No. 11). This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of

Civil Procedure.   For the reasons stated below, this report recommends that the final decision of the Commissioner be affirmed.

## I.   **PROCEDURAL BACKGROUND**

Gautreau applied for DIB on May 31, 2012, and alleged that he was disabled as of January 2, 2011.   (R. 64-65).   The Commissioner denied his application initially, (R. 88), and upon reconsideration, (R. 83).   Gautreau then requested an administrative hearing, (R. 92), which the ALJ held on December 11, 2013, (R. 30).   On January 8, 2014, the ALJ concluded that Gautreau was not disabled within the meaning of the Social Security Act and denied his claim for DIB.   (R. 23).   The Appeals Council then denied Gautreau's request for review of the ALJ's decision (R. 1), thereby making the ALJ's decision the final decision of the Commissioner.   Pursuant to 42 U.S.C. § 405(g), Gautreau filed this action seeking judicial review of the Commissioner's decision.   This case is now before the court on the parties' cross-motions for summary judgment.

## II.   **FACTUAL BACKGROUND**

Gautreau was born in 1961 and was forty-nine years old on his alleged disability onset date.   (R. 22).   Gautreau's past work included service in the United States Marine Corps from 1979 to 1988 as a combat engineer and legal service specialist.   (R. 38-39).   After his military service, Gautreau worked as a

2

store manager at a combined gas station and convenience store, (R. 40), in advertising sales for a newspaper, (R. 40-41), as an advertising manager at a newspaper, (R. 41), and as a recreational vehicle sales representative. Id. He has not worked since his disability onset date of January 2, 2011. Id. In his current appeal, Gautreau complains of degenerative disc disease, hearing impairment, vision impairment, post-traumatic stress disorder and mental impairments, and nerve damage in his hands. See Pl.'s Br. Supp. Mot. Summ. J. (ECF No. 11, at 2); see also (R. 74).

From 2010 to the present, Gautreau received medical treatment and services through the Department of Veteran's Affairs. In May 2010, he presented to Nurse Practitioner Geraldine Lau for his first health care visit in ten years.[1] (R. 368). Ms. Lau noted that he had a medical history of hypertension, tinnitus mostly in his left ear, chronic back pain over the last three to five years, and a heart murmur from birth. Id. When analyzing x-rays in July 2010, Ms. Lau reported that he had "intervertebral disc space narrowing" consistent with degenerative disc disease in his spine, and in his hip "two small bone fragments [were] seen ... likely

---

[1] Although the treatment that Gautreau received between May 2010 and December 2010 is before his alleged disability onset date – January 2, 2011 – this report briefly discusses this treatment because later treatment is based on symptoms that were examined and diagnosed during this period.

representing small broken osteophytes from mild degenerative change." (R. 229-31). Audiologist Lori A. Pinkham tested Gautreau for hearing loss in July 2010, and reported that he was "a candidate for binaural amplification." (R. 365-68). In September 2010, Gautreau was evaluated for post-traumatic stress disorder ("PTSD"). (R. 355). He stated that he had "not been sleeping except 2-3 hrs at a time ... [and] [a]lmost nightly [he] ha[d] combat dreams, and [he had not] even had any combat experience." Id. At this evaluation, he also stated that he "drink[s] 4-5 times a week, 5-6 beers, [for] most of [his] life." Id. When describing his mood, he said it was "fair," stating that "for fun" he "jog[s] and cycle[s] almost every day," and his motivation and concentration were "OK" with "no trouble [focusing]." Id. The provider diagnosed him with alcohol dependence, and he declined medication, but stated that he was interested in therapy. (R. 357).

In January 2011, which is the month that Gautreau alleges the onset of his disability, he reported to Audiologist Lori A. Pinkham and received a hearing aid for his hearing loss and tinnitus. (R. 338-40). At a primary care appointment later that same month, Nurse Diane Ballard, reported that he did not attend his physical therapy appointment for his back pain as recommended in her November 2010 treatment plan, and he had shoveled snow within the last twenty-four hours. (R. 335).

4

On February 14, 2011, Gautreau presented to Psychiatric Nurse Practitioner Fay E. Reilly for mental health counseling. (R. 333-35). Gautreau reported that he had lost his job, but felt "OK about that" and was "enjoying unemployment [and] spending time with his family." Id. Ms. Reilly administered a GAF (Global Assessment of Functioning) mental health assessment and reported a GAF score of 65.[2] (R. 334). She recommended that he take citalopram for depression at a 20 milligrams dosage, which could be increased to 40 milligrams. Id.

Following a fainting spell on May 9, 2011, in which Gautreau "hit[] the floor and lost consciousness for 30-60 seconds," he presented to urgent care, complaining of chest pain. (R. 318-28, 330). A chest x-ray at this appointment revealed no acute pulmonary process and that his lungs were clear. (R. 296). He was referred for a cardiac event monitor and stress test, and given metorprolol (an antihypertensive agent). (R. 326); see also (ECF No. 13, at 4). At his cardiac event monitor on May 18, 2011, Dr. Daniel Lombardi reported a

---

[2]    Clinicians use the GAF scale, devised by the American Psychiatric Association and ranging from zero to one hundred, to indicate an overall judgment of a person's psychological, social, and occupational functioning. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000). A GAF of 71-80 indicates that "if symptoms are present, they are transient and expectable reactions to psycho-social stressors;" a GAF of 61-70 indicates that the individual has "some mild symptoms;" a GAF of 51-60 indicates that the individual has "moderate symptoms;" and a GAF of 41-50 indicates that the individual has "serious symptoms." Id. However, the DSM-5 abandoned the use of GAF scores as a diagnostic tool for assessing a patient's functioning because of the questionable probative value of such scores. Diagnostic and Statistical Manual of Mental Disorders (DSM-V) 16 (5th ed. 2013).

normal test result with "three reports of chest discomfort and shortness of breath, all correlating with sinus rhythm," and "two isolated atrial premature beats and underlying artifact on 2 of the 3 transmissions." (R. 316). His stress test resulted in "[n]o evidence for a reversible perfusion abnormality ... [with] good exercise tolerance." (R. 295).

On June 6, 2011, Gautreau presented to his primary care provider for a preventative care appointment. (R. 306-10). He reported no significant changes in his health, and he stated that he "fel[t] pretty good today.... [and had gone] for a walk." (R. 307-08). His primary care provider reported that Gautreau's hypertension was "stable on his current treatment" and that he continued to have chronic back pain, tinnitus, and depression. Id. The provider also encouraged Gautreau to stop his tobacco use and to reduce his alcohol consumption. (R. 308). On June 13, 2011, Gautreau saw Psychiatric Nurse Practitioner Fay Reilly for mental health therapy. (R. 304). Ms. Reilly described Gautreau as "anxious" and his "[a]ffect [wa]s congruent with stated mood." Id. She also reported a GAF score of 55. (R. 305).

On September 7, 2011, Gautreau again presented to his primary care provider complaining of a "flare-up" of his low back pain. (R. 283-86). Dr. Claudia J. Bahorik found his trunk range of motion to be limited and prescribed Tylenol with

6

codeine.   (R. 285-86).   On November 16, 2011, he presented to his primary care provider following a bicycling accident.   (R. 275-79).   Upon examination, Nurse Practitioner Erika Blocher reported that he had discoloring and tenderness to touch and movement in his left periorbital area.   Id.   At a May 12, 2012, mental health appointment with Ms. Reilly, Gautreau reported that he was having hallucinations that were similar to vivid dreams.   (R. 248).   Ms. Reilly assigned a GAF score of 45, and noted that he was "alert and oriented" with an anxious mood, and that his "[a]ffect [wa]s congruent with stated mood."   (R. 249-50).   She also reported: "There is no evidence perceptual disturbance.... Thought processes are logical and linear.... Insight is poor. Judgment is impaired."   (R. 249).

In August 2012, Dr. Steve Harris reported that Gautreau had "[v]ery significant symmetrical high and mid-range frequency neurosensory loss associated with tinnitus," and he recommended that Gautreau "continue with his VA-based amplification."   (R. 545).   That same month, Gautreau presented to Dr. Richard Meadows who found that Gautreau had mild tenderness at his lumbar spine, normal straight leg raise, normal tandem gait, and some difficulty squatting halfway and then rising.   (R. 550). Dr. Meadows reported that Gautreau had five- to ten-degree limitations in his dorsolumbar range of motion, and he diagnosed Gautreau with unspecified backache, problems with hearing,

benign essential hypertension, anxiety, and osteoarthrosis involving multiple sites. Id.

In September 2012, Gautreau presented to Clinical Psychologist David Ghostley. (R. 552-54). Gautreau reported that "his mood [w]as 'generally pretty good, but it doesn't take much to [make] me upset.' " (R. 553). He stated that on a typical day, "he generally does a lot of walking and often ends up at the library to enjoy quiet time and reading." Id. Dr. Ghostley reported that Gautreau's "ability to function independently and manage finances [wa]s unimpaired," but "his ability to understand, remember, and carry out instructions [wa]s mildly impaired, while his ability to respond appropriately to supervisors, co-workers, and work pressures in a work setting [wa]s mildly to moderately impaired." (R. 553-54). That same month, Gautreau was evaluated by state agency expert physician Dr. Delsadie Callins, who reviewed his medical record and opined that he retained the residual functional capacity to occasionally lift and/or carry fifty pounds; stand, walk, and/or sit for about six hours; occasionally stoop; and was limited in that he could never climb ladders, ropes, or scaffolds; needed to avoid concentrated exposure to extreme temperatures and noise; needed to avoid all activities requiring binocular vision; and needed to avoid contact with hazardous machinery, unprotected heights, and uneven terrain. (R. 77-79).

In October 2012, Gautreau presented to registered nurse Laura Laguerra for pain in his back. (R. 583-86). He reported that he had stabbing, sharp, and dull pain that was a four on a scale from one to ten, and that in the last month he had experienced the highest level of pain, a ten. (R. 583). Ms. Laguerra recommended that he take diclofenac, an NSAID pain reliever, prior to his pain reaching level nine. (R. 586). That same month, he also reported to registered nurse Laura Lawford for a physical examination, complaining of some vision loss and low back pain, which he rated a four out of ten. (R. 593-600). Ms. Lawford found his lungs to be clear, his cardiac function to be regular, and he exhibited no edema in his extremities. (R. 596-97). In December 2012, Audiologist Tim Landers opined that Gautreau had a speech discrimination score of 90 percent for both his right and left ears at sixty decibels, and diagnosed bilateral sensorineural hearing loss to be treated with his current hearing aids. (R. 627-28).

On February 21, 2013, after Gautreau moved back to Virginia, he presented to Dr. Anita Sager at the Veteran's Affairs Medical Clinic in Hampton, Virginia. (R. 647, 964-67). He reported that his low back pain was better with medication and his hearing loss and tinnitus was stable. (R. 966). Dr. Sager reported that a prior x-ray indicated that he had degenerative disc disease, and that at this appointment he had

no chest pains, palpitations, pain in his lower right back, or depression. (R. 965). At the same appointment, Gautreau was screened for post-traumatic stress disorder and reported no current symptoms associated with the disorder. (R. 970). In March 2013, Dr. Fessehai Tekle saw Gautreau for a physical examination to determine his eligibility for admission into a housing treatment program. (R. 941-47). Dr. Tekle found he had no tenderness in his back, his muscular coordination and muscle bulk was normal, his strength was 5/5 throughout, and he was able to ambulate freely. (R. 945).

On April 23, 2013, Gautreau presented to Dr. Sager, complaining of back pain. (R. 1013). He stated that medication reduced his pain level to a three or a four, but that he could not sit still and "ha[d] to change position after 5-10 minutes," "alternat[ing] between sitting and standing throughout the day." (R. 1014). He also reported that he has "flare ups with muscle swelling, increased pain ... once/month for 2-3 days," which require him to limit his activity for those days. Id. In addition to low back pain, he reported that he "often has tingling in [his] fingers" from frostbite that he received in Alaska in 1985, but on "good days" he has no problem picking things up. Id. He said that he "need[ed] to avoid cold, noisy situations" because of difficulty hearing and a dislike of being in an "enclosed space." Id.

Upon examination, Dr. Sager found that his lungs were clear bilaterally, he had "glove numbness to light touch on hands," and "moderate to severe L4-S1 level degenerative changes to the lumbar spine." (R. 1015). Dr. Sager diagnosed him with chronic low back pain, which interfered with prolonged sitting/standing/stooping/bending," and numbness in his fingers. Id. She indicated that he had "employment difficulty" because he does "not work well for someone." Id.

Following Gautreau's April 2013 appointment, Dr. Sager completed an RFC questionnaire in which she stated that she had been Gautreau's primary care physician since February 21, 2013, and she opined that Gautreau's prognosis for improvement was fair. (R. 987). She diagnosed him as having chronic low back pain due to degenerative disc disease, finger numbness, adjustment disorder with mixed emotions, and hypertension. Id. She reported that he could not sit or stand for more than five to ten minutes without then having to change positions; that he could occasionally lift and/or carry up to ten pounds; that he could use his hands to grasp, turn, and twist objects for an entire eight-hour day; that he could use his fingers for fine manipulations for an entire eight-hour day; that he could reach overhead no more than 20 percent of an eight-hour workday; and that he needed to avoid cold temperatures due to a history of frostbite and noise due to difficulty hearing. (R. 990-91).

11

Dr. Sager completed a follow-up RFC form in November 2013 and stated that Gautreau suffered from chronic low back pain due to degenerative disc disease, which would affect his ability to focus and stay on task for 60 percent of the day in a work setting. (R. 1016). She also opined that he could occasionally lift and/or carry twenty-five pounds and could use his hands for repetitive actions, such as simple grasping, pushing, and pulling, but could not engage in fine manipulation. (R. 1017). She noted that he experienced other limitations, including a need to avoid unprotected heights, moving machinery, marked changes in temperature and humidity, and exposure to dusts, fumes, and gases. (R. 1018).

At the administrative hearing on December 11, 2013, Gautreau testified that low back pain from his degenerative disk disease requires him to "constantly ... shift and adjust positions to make my lower back and upper torso comfortable." (R. 46). In terms of carrying items, he stated that his back pain limits him to carrying a shoulder bag with books in it. (R. 54). He also testified that he was treated for frostbite on his hands during his service in the Marine Corps, which resulted in continued sensitivity and reduced "grasping and gripping" capability. (R. 43-45). He stated that his tinnitus and hearing loss reduces his concentration and that he wears his prescribed hearing aids only "about 50 percent of the time"

because the amplification combined with his tinnitus sometimes can cause more problems. (R. 47-48). With regard to his treatment for depression and PTSD, Gautreau said that he had nightmares about "the military days and the physical assaults and abuse that [he] received in 1979 ... in the Marine Corps boot camp training." (R. 51). He stated that he does not have a driver's license because of a DUI in 2006, but is eligible to get it back if he wanted to do so. (R. 53). Instead, he uses public transportation or is driven to friends. Id. He also testified that he volunteers at a local food pantry. Id.

In addition to testimony from Gautreau, the ALJ also examined Edith Edwards, a Vocational Expert ("VE"). The VE first characterized Gautreau's relevant past work as light, skilled work. (R. 55-56). Because Gautreau turned fifty years old in September 2011, the VE stated that he was "defined as an individual closely approaching advanced age." (R. 56). In examining the VE, the ALJ noted that although Gautreau could no longer perform his past work, a hypothetical person with the limitations described by the ALJ could perform work as an unarmed security guard (at the light level, unskilled with 75,000 of these jobs nationally), hand packer or bander/worker (light unskilled with 450,000 nationally or sedentary with 300,000 nationally), or table worker (unskilled sedentary with 80,000 nationally). (R. 57-58). She testified that her

13

responses were consistent with the DOT classifications except for the "fact that the DOT classifies the security [guard position] as semi-skilled" and her reduction in numbers for the unskilled positions was based on her knowledge of the job. (R. 58).

On cross-examination by Gautreau's counsel, the VE explained certain requirements of each position. Counsel noted that the ALJ had limited Gautreau to frequent but not constant grasping and only occasional fine manipulation. The VE responded that the jobs did require frequent grasping – which she described as gross manipulation and that the jobs she described did not involve fine manipulation. Fine manipulation, according to the VE "is more like handling a pencil, typing on a computer, or working with electronics where you're dealing with little teeny things." (R. 58-59).

Gautreau's counsel also inquired whether the security guard position would conflict with the ALJ's restriction limiting contact with others. The VE explained that it would not conflict at the reduced numbers she provided. She noted that the overall job description for security guards included more than three million positions. "I'm only saying 75,000 . . . a very low number." This much lower number of security guard positions she characterized colloquially as a "babysitter" requiring general observation and responding to emergencies at

unattended facilities. She described the position as the perfect job for someone with limited ability to be around people. (R. 60-61).

### III. **STANDARD OF REVIEW**

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of New York v. NLRB, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's]

15

designate, the ALJ)." <u>Craig</u>, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. <u>Perales</u>, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

### IV. **ANALYSIS**

To qualify for disability insurance benefits under sections 416(i) and 423 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application for disability insurance benefits and a period of disability, and be under a "disability" as defined in the Act. The Social Security Regulations define "disability" as the: "Inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); <u>see also</u> 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A). To meet this definition, a claimant must have a "severe impairment" that makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a); <u>see</u> 42 U.S.C. §

16

423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled.  The five questions which the ALJ must answer are:

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do the work activities?

3. Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (a "listed impairment" or "Appendix 1")?

4. Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5. Does the individual's impairment or impairments prevent him or her from doing any other work?

An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability.  An affirmative answer to question three or five establishes disability.  This analysis is set forth in 20 C.F.R. §§ 404.1520 and 416.920.  The burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step.  <u>Pass v. Chater</u>, 65 F.3d

1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).

When conducting this five-step analysis, the ALJ must consider: (1) the objective medical facts; (2) the diagnoses and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age. Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967) (citing Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962)). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. Hays, 907 F.2d at 1456.

## A.    The ALJ's Decision

In this case, after first finding that Gautreau met the insured status requirements of the Social Security Act through March 31, 2016, the ALJ made the following findings under the five-part analysis: (1) Gautreau had not engaged in gainful activity since his alleged onset date of January 2, 2011; (2) he had severe impairments of degenerative disc disease, affective disorder, anxiety disorder, alcohol abuse, hearing impairment, post-traumatic stress disorder, and neuropathy of the hands from frostbite; (3) he did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in Appendix 1; and (4) he had the RFC to perform the full range of light work activities with the

18

following limitations. He could only have occasional interaction with coworkers and the public; he could engage in frequent, but not constant handling and grasping with only occasional fine manipulation; he could perform simple, routine, repetitive tasks in a stable work environment; and he had to avoid: climbing ladders, ropes, or scaffolding; fine vision for close-up work; exposure to temperature extremes and excessive noise; and commercial driving. (R. 13-21). At step five, relying on the VE's testimony, the ALJ concluded that jobs which Gautreau can perform exist in significant numbers in the national economy. (R. 22).

In making his RFC determination and finding of no disability, the ALJ discussed the evidence supported by the medical record, and gave moderate weight to the Disability Determination Explanation ("DDE"), but ultimately found that the record's medical evidence showed that Gautreau was more limited in his RFC than set forth in the DDE. (R. 20, 69-84). The ALJ also found "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." (R. 18).

Gautreau advances three arguments urging the court to reverse or vacate the Commissioner's decision. First, he argues

that the ALJ's RFC did not account for his deficits in social functioning, concentration, persistence, and pace of activity in a work setting, and other mental impairments. (ECF No. 11, at 1-2). Second, he argues that the ALJ failed to ask the VE hypothetical questions that accounted for all of his impairments. Id. Third, he argues that the VE's testimony conflicts with the DOT definitions for the jobs available to him, as identified by the VE, and the ALJ did not explain these differences. Id. at 2. This report examines each argument and recommends that the court find that the ALJ's decision was supported by substantial evidence because the ALJ correctly assessed Gautreau's RFC, and properly relied on the VE's testimony and the occupational definitions in the DOT.

**B.  The ALJ Properly Accounted for Gautreau's Mental Impairments When Making His RFC Determination.**

Gautreau first contends that the ALJ's RFC failed to account for his limitations in social functioning, concentration, persistence, and pace of activity in the work setting. Memo. in Supp. Pl.'s Mot. Summ. J. (ECF No. 11, at 1). An RFC is the plaintiff's maximum ability to work despite his impairments. 20 C.F.R. § 404.1545(a)(1); see Social Security Ruling 96-9p, 1996 WL 374185 (S.S.A.) ("RFC is the individual's maximum remaining ability to perform sustained work on a regular and continuing basis."). When, as is the case here, a

plaintiff's impairments do not meet or equal a listed impairment under step three of the sequential analysis, the ALJ must determine the plaintiff's RFC. 20 C.F.R. 404.1520(e). At step four, the ALJ then determines whether the plaintiff can perform his past relevant work. Id. § 404.1545(a)(5)(i). If the ALJ determines that the plaintiff cannot perform any relevant past work, as was the case for Gautreau, the ALJ uses the RFC at step five to determine if the plaintiff can "adjust to any other work that exists in the national economy." Id. § 404.1545(a)(5)(ii).

The ALJ is responsible for determining a plaintiff's RFC at the administrative hearing level, and in making this determination, the ALJ considers all of the relevant medical and other evidence[3] in the record. Id. §§ 404.1527(b), 404.1545(a)(3), 404.1546(c). "[R]elevant evidence ... include[es] information about the individual's symptoms and any 'medical source statements' – i.e., opinions about what the individual can still do despite his or her impairment(s) – submitted by an individual's treating source or other acceptable medical sources." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A.).

Here, the ALJ determined that Gautreau has the RFC to perform light, unskilled work in a stable work environment while

---

[3]    "Other evidence" includes "statements or reports from [the claimant], [the claimant's] treating or nontreating source, and others about [the claimant's] medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how ... how impairment(s) and any related symptoms affect [the claimant's] ability to work. 20 C.F.R. § 404.1529(a).

performing simple, routine, repetitive tasks with added limitations on handling, grasping, climbing, driving, vision, temperature and noise exposure, and interaction with others. (R. 17). Gautreau contends that the ALJ's RFC did not adequately account for his mental impairments. Mem. Supp. Pl.'s Mot. Summ. J. (ECF No. 11, at 21-22). Specifically, he argues that the ALJ ignored evidence that "found limitations in [his] ability to maintain attention and concentration for extended periods, his ability to complete a normal workday and work week without interruptions from psychologically based symptoms" and limitations in "his ability to perform at a persistent pace without an unreasonable number and length of rest periods, his ability to accept instructions and respond appropriately to supervisors, and his ability to respond appropriately to changes in the work setting." Mem. Supp. Pl.'s Mot. Summ. J. (ECF No. 11, at 20-21). But these limitations do not appear in the analysis of medical records underlying Gautreau's RFC. Instead, these quotes are from the ALJ's recitation of broad criteria used to assess whether the Defendant has a severe mental impairment at Steps 2 and 3 of the sequential analysis. The actual analysis of medical records, which was discussed in the ALJ's Step 4 inquiry, makes clear that the RFC imposed limitations that adequately account for Gautreau's mental impairments.

22

In Mascio v. Colvin, the Fourth Circuit held that the ALJ's "residual functional capacity 'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis,' " and "only after that may [residual functional capacity] be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." 780 F.3d 632, 636 (4th Cir. 2015) (quoting Social Security Ruling 96-8p, 61 Fed. Reg. 34,474, 34,475 (July 2, 1996)). Additionally, the Fourth Circuit noted that "the residual functional capacity 'assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts ... and nonmedical evidence.' " Id. (quoting Social Security Ruling 96-8p). When the ALJ does not perform an explicit function-by-function analysis, "remand may be appropriate ... where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Id. (quoting Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)).

Here, the ALJ properly examined the evidence in the record, and performed a function-by-function analysis, discussing the evidence and the weight he gave to the evidence. With regard to Gautreau's mental impairments, the ALJ discussed Gautreau's own

23

testimony, as well as mental status examinations he received in September 2012, December 2012, and January 2013.   (R. 19). Specifically, the ALJ assigned moderate weight to an examination on September 12, 2012, performed by Dr. David C. Ghostley, in which he found:

> [that Gautreau's] mood [was] ... "generally pretty good, but it [did] not take much to upset [him]," ... his attention was adequate for conversational purposes; with regard to concentration, he was able to calculate 7 out of 8 differences correctly when performing reverse serial 7's; ... his insight into acknowledging his problems and accepting responsibility for them was considered mildly impaired; [and] his judgment with regard to social functioning and family relationships was also impaired by moodiness.

(R. 19).   The ALJ gave moderate weight to this September 12, 2012, opinion because he found that it was "somewhat consistent with the normal/ mild/ moderate findings on mental status examinations" in the record.   (R. 20).   The ALJ also gave moderate weight to the Disability Determination Explanation, which concluded that Gautreau "has the residual functional capacity to perform limited medium work; ... has mild difficulties in maintaining social functioning; [and] has mild difficulties in maintaining concentration, persistence, or pace."   Id.; see also (R. 69–84).   In addition, the ALJ "completely reject[ed]" the medical source statements of Dr. Anita Sager, a treating physician with a limited history of caring for Gautreau.   Dr. Sager had opined that Gautreau would

require frequent absences and be unable to sustain full time work. (R. 988-92). But the ALJ explicitly noted the brevity of her treating relationship, and her opinion's inconsistency with the medical evidence of record. (R. 21). The ALJ also discussed Gautreau's hearing testimony, and concluded that his "allegations of disabling impairments ... [were] inconsistent with objective findings and subjective findings." Id. As shown by the ALJ's analysis, he discussed the evidence presented in the record item-by-item and fashioned an RFC that accounted for Gautreau's limitations. See (R. 17-21). That is all that is required under substantial evidence review.

Unlike the plaintiff in Mascio, Gautreau's RFC included specific limitations to accommodate his mental impairments. For example, the RFC limited him to "performing simple, routine, repetitive tasks, in a stable work environment" and provided that he could "have only occasional interaction with coworkers and the public." (R. 17). In framing his hypothetical to the VE, the ALJ also imposed a restriction on all commercial driving. (R. 56). As shown by the ALJ's detailed analysis of the evidence in the medical record, his RFC not only considered all of the evidence - both physical and mental symptoms - but also properly accounted for any impairments supported by the record. Accordingly, the undersigned finds that the ALJ's RFC was supported by substantial evidence.

C.   **The VE's Testimony in Response to Hypotheticals Properly Accounted for Gautreau's Mental Impairments.**

Gautreau next contends that the ALJ relied on testimony from the VE that did not properly account for all of his impairments. (ECF No. 11, at 22). That is, Gautreau claims that the "ALJ's hypothetical question posed to the vocational expert ... contained only those limitations he subsequently found to constitute Mr. Gautreau'[s] residual functional capacity," and because the RFC was not proper, the testimony of the VE was also incomplete. (ECF No. 11, at 23).

At the administrative hearing, the ALJ poses hypothetical questions to the VE, and these hypotheticals must account for all of the claimant's limitations as shown by the record. Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989). If limitations are omitted, the VE's testimony is of limited value, and may not constitute substantial evidence. See Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005) (citing Walker, 889 F.2d at 50). Failing to consider limitations shown by the evidence, and then relying upon the errant hypothetical to form an opinion about the availability of work suitable to the claimant is error. Hancock v. Barnhart, 206 F. Supp. 2d 757, 767 (W.D. Va. 2002).

With regard to mental impairments, the Fourth Circuit in Mascio stated that "an ALJ does not account 'for a claimant's

26

limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.' " Mascio, 780 F.3d at 638 (citing Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011)). If the ALJ concludes that "the concentration, persistence, or pace limitation does not affect [the claimant's] ability to work," the ALJ is required to "explain why ... [a finding of] moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation in [the] residual functional capacity." Id. Only after providing this explanation would it be "appropriate to exclude [these limitations] from the hypothetical tendered to the vocational expert." Id.

In this case, as in Mascio, Gautreau's reference to moderate limitations in concentration, persistence and pace are derived from the ALJ's analysis of the "paragraph B criteria," used to rate the severity of a mental impairment at Steps 2 and 3 of the sequential evaluation process. As set forth in the ALJ's opinion, that paragraph B assessment was based almost entirely on Gautreau's self-report of symptoms. (R. 15). The ALJ correctly observed that the mental residual functional capacity assessment used at Steps 4 and 5 requires a more detailed function-by-function analysis of the various functions which are broadly defined in the paragraph B criteria. (R. 16).

Here, unlike in Mascio, the ALJ correctly performed that analysis. He first noted his agreement with Dr. Ghostley's assessment of Gautreau's relatively good concentration. (R. 19) ("[a]ble to calculate 7 out of 8 differences correctly."). Dr. Ghostley also noted that Gautreau had adequate attention and his ability to function independently and maintain his finances was unimpaired. (R. 20). Dr. Ghostley did note that Gautreau had impaired social functioning caused by moodiness. (R. 19). The ALJ also explicitly rejected the medical source statements from Dr. Sager, which are the only medical testimony suggesting Gautreau would be unable to sustain full time work or require frequent unscheduled absences. (R. 20).

Thus, as anticipated by Mascio, the ALJ in this case explained why the moderate limitation in the broad paragraph B criteria of concentration, persistence and pace, translated into narrower limits in the function-by-function analysis required to arrive at his RFC. Mascio, 780 F.3d at 638. When examining the VE, the ALJ properly incorporated those mental status limitations which were supported by the medical evidence in his function-by-function analysis. He first asked her to characterize Gautreau's past work, which she characterized as light, skilled work. (R. 55-56). Because of Gautreau's age and other limitations, the ALJ determined that he could not perform his past work at the light, skilled level. (R. 56-57). The ALJ

then crafted a hypothetical that included the limitations set forth in the RFC, such as restricting Gautreau's work to "simple, routine, repetitive tasks, in a stable environment with only occasional interaction with both the public and coworkers." (R. 56-57). Based on the ALJ's hypothetical, the VE testified that jobs exist in significant numbers in the national economy for light, unskilled work, which Gautreau could perform. (R. 57). Specifically, the VE identified the positions of an unarmed security guard (light, unskilled work at the numbers offered), hand packer or bander/ worker (light, unskilled work, or sedentary, unskilled work), and table worker (sedentary, unskilled work). (R. 57-58). When examined by Gautreau's attorney, the VE also testified that the ALJ's restriction to occasional fine manipulation would not preclude the table worker and hand bander jobs, which she said involved handling larger objects. If the ALJ had found that Gautreau could only engage in occasional, not frequent, gross manipulation with his hands, the VE stated that he would be limited to work as an unarmed security guard. (R. 59). Finally, the VE testified that there would be no work if a person was off-task up to 20 percent of the day or more. (R. 62). But, the ALJ's RFC did not impose these restrictions because they were not supported by the medical record.[4] Accordingly, the ALJ properly relied on the

---

[4] In his briefing, Gautreau has identified no medical evidence, which was not

above hypothetical and the VE's testimony in concluding that light or sedentary, unskilled work within his limitations was available to Gautreau. (R. 17, 22).

Unlike the facts in Mascio, the ALJ specifically cited medical evidence and Gautreau's testimony to explain the specific functional limitations he found at Step 4. And he included limitations on Gautreau's interaction with others and commercial driving in addition to limiting him to "simple, routine, repetitive tasks" and a "stable work environment." (R. 17, 56-57). Finally, the VE testified extensively regarding her knowledge of the jobs at issue, and in the case of security guards, offered the position at reduced numbers to account for Gautreau's mental limitations. Accordingly, the undersigned finds no error of law in the ALJ's framing of the hypothetical or his reliance on the VE's testimony.

**D.    The VE Explained All Alleged Discrepancies Between the VE's Testimony and the Dictionary of Occupational Titles.**

Gautreau's final argument is that the ALJ relied on testimony from the VE that did not align with the DOT, and the ALJ did not explain these differences. (ECF No. 11, at 23-26). The Fourth Circuit, in an opinion issued after Gautreau and the Commissioner submitted their respective motions, clarified the

---

explicitly rejected by the ALJ, suggesting that he would be off-task up to 20 percent of the day or that he would only be able to use his hands for occasional gross manipulation.

degree of conflict necessary to warrant explanation by the ALJ of differences between the VE's testimony and job descriptions in the DOT.   See Pearson v. Colvin, 810 F.3d 204 (4th Cir. 2015).

In Pearson v. Colvin, the Fourth Circuit concluded that the ALJ must independently identify and explain conflicts when "the vocational expert's testimony apparently conflicts with the Dictionary." Id. at 211. The ALJ should then resolve the inconsistency with help from the VE's testimony.   Id. In reaching this conclusion, the Fourth Circuit discussed Social Security Ruling 00-4p, which "require[s] the ALJ (not the vocational expert) to '[i]dentify and obtain a reasonable explanation' for conflicts between the vocational expert's testimony and the Dictionary [DOT], and to '[e]xplain in the determination or decision how any conflict that has been identified was resolved.' " Id. at 208 (citing Social Security Rule 00-4p, 2000 WL 1898704 (S.S.A. 2000)) (emphasis in original). Thus, the ALJ must first ask the VE if the evidence she provides conflicts with the DOT, and second the ALJ "must 'obtain a reasonable explanation for ... [any] apparent conflict.'" Id. The Fourth Circuit emphasized that

> this second requirement is so independent of the first that it does not rest on the vocational expert's identification of a conflict[;] [r]ather, SSR 00-4p directs the ALJ to "resolve the conflict by determining if the explanation given by the [expert]

is reasonable," and to "explain the resolution of the conflict <u>irrespective of how the conflict was identified.</u>"

<u>Id.</u> (emphasis in original). In so holding, the Fourth Circuit clarified that certain conflicts must be explained even if neither the claimant nor the VE points them out during the hearing. But in defining which conflicts require this affirmative explanation the court rejected the standard proposed by the claimant – to explain all "possible" conflicts – and the standard proposed by the Commissioner – to explain only "obvious" conflicts. <u>Id.</u> at 209-10 Instead, the court struck a middle ground requiring explanation of conflicts that are "apparent." <u>Id.</u> at 209. "The 'apparent' conflict standard ... embraces the reality that, in many cases, testimony may only <u>appear</u> to conflict with the Dictionary, and the vocational expert may be able to explain that, in fact, no conflict exists." <u>Id.</u> (emphasis in original). If the VE does not explain the apparent conflict, "the expert's testimony cannot provide substantial evidence to support the ALJ's decision." <u>Id.</u>

In <u>Pearson</u>, the VE had identified three occupations available to the Plaintiff, and the DOT listed "frequent reaching" as a requirement for all three. <u>Id.</u> at 210. When comparing the DOT definition to Pearson's limitations – "Pearson's nondominant arm could only occasionally reach

32

upwards" – the Fourth Circuit held that "the vocational expert's testimony that Pearson could fulfill the requirements of these occupations apparently conflicts with the Dictionary." Id. at 211 (emphasis in original). Specifically, Pearson was limited in his ability to reach over his head with only one arm, so the VE should have testified as to "how many of these positions do not require frequent bilateral overhead reaching." Id. Because the ALJ failed to ask the VE about this "apparent conflict," the VE's testimony could not provide substantial evidence to support the ALJ's decision. Id. at 209-11. The Fourth Circuit, however, noted that

> [d]eciding that the vocational expert's testimony
> apparently conflicts with the Dictionary here does not
> mean that an ALJ must find Pearson, or any other
> claimant with this limitation, unable to perform these
> jobs. Rather, it simply means that the ALJ and the
> expert should address exactly what form of reaching
> the stated occupations require and whether the
> claimant can fulfill those requirements.

Id. at 211.

In this case, when responding to the ALJ's hypothetical, the VE stated that Gautreau could work as an unarmed security guard, which she described as unskilled work at the numbers she provided, or as a hand packer or bander/ worker in several different industries. (R. 57-58). The ALJ then asked the VE: "Other than the fact that the DOT classifies the security [guard position] at semi-skilled, are all of your responses consistent

with the DOT?" (R. 58). The VE answered "Yes," and the ALJ did not ask any additional questions about the VE's testimony. See (R. 58-63). However, the VE provided additional explanation and clarification in her testimony during cross-examination.

Gautreau now argues that the DOT description of the positions identified by the VE would require him to engage in work that conflicts with the ALJ's RFC and hypothetical. For example, position number 920.867-030, a hand bander in the tobacco industry, requires the employee to "[w]rap[] trademark band[s] around cigars," and requires constant reaching, handling, and fingering. Dictionary of Occupational Titles, 920.687-030, 1991 WL 687968 (4th ed., rev. 1991). Indeed, even without the benefit of Pearson's revised framework the Commissioner concedes that the DOT description for this position likely conflicts Gautreau's RFC limits which restricted him to frequent, but not constant handling.

But the VE also identified other positions which do not conflict with Gautreau's limitations, and she explained any apparent conflicts that may have existed. For example, the hand bander in the paper goods industry, number 920.687-026, and table worker in the fabricated products industry, number 739.687-182, were both identified as additional jobs available to Gautreau. (R. 57-58). Both positions require frequent (but not constant) handling and fingering. Dictionary of

34

Occupational Titles, 920.687-026 & 739.687-182, 1991 WL 687967, 680217 (4th ed., rev. 1991).     The ALJ's RFC and hypothetical limited Gautreau to "frequent but not constant handling and grasping," only "occasional fine manipulation." (R. 17, 56). The production occupations identified by the VE, both the table worker and hand bander in the paper goods industry, use the term "fingering" to describe tasks performed frequently during the work. "Fingering" is defined in the DOT as "[p]icking, pinching, or otherwise working primarily with fingers rather than with the whole hand or arm as in handling."  See Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, App. C. Physical Demands (U.S. Dep't of Labor 1993). Because both the hand bander and table worker positions require frequent fingering, and Gautreau's RFC permits frequent handling and grasping, but only occasional "fine manipulation," the VE's testimony presented a possible conflict with the RFC limitation, if the ALJ's limit for "occasional fine manipulation" equates to a limit to occasional "fingering." But it is not necessary to decide whether this conflict would have been "apparent" based solely on the VE's direct testimony, because on cross-examination the VE provided a detailed explanation about the distinction between "fine manipulation" and the type of "fingering" required for the hand bander/packer positions she

35

was relying on.[5]

The VE also identified the security guard position as another job available to a hypothetical person with Gautreau's limitations.  Dictionary of Occupational Titles, 372.667-034, 1991 WL 673100 (4th ed., rev. 1991). It is not clear what DOT conflict Gautreau relies on for this position.  His brief merely notes that "partially deaf persons do not make great security guards."  (ECF No. 11, at 25) (citing the website Occupational Information Network listing of abilities essential to the job.) But Gautreau's hearing loss is corrected with hearing aids, and the DOT's description does not define any particularly high degree of hearing ability required for the position.

The ALJ's RFC and hypothetical also limited Gautreau to work in a stable environment with "only occasional interaction with coworkers and the public."  (R. 17, 56-57).  With this restriction, the DOT definition for the security guard position would appear to present conflicts that required explanation. For example, the DOT description suggests occupants are required to deal with people and tolerate stress.  Dictionary of Occupational Titles, 372-667-034, 1991 WL 673100.  But again, the VE testified about the potential conflicts with the occupational definitions in the DOT, and her testimony provides

---

[5]  Gautreau's attorney asked the VE whether the hand bander and hand packer positions required fine manipulation, and the VE stated that she "did gross manipulation for these titles."  (R. 58).

substantial evidence to support the ALJ's decision.

Specifically, the VE testified that she drastically reduced the number of available security guard positions – from three million to 75,000 – to account for the limits imposed by Gautreau's RFC. (R. 61). She noted these were unskilled positions at specific vocational preparation level 2 (SVP 2). She described the security guard positions available in those numbers as involving little to no contact with others. She described them – perhaps too informally – as "the babysitter jobs," involving mostly night work reporting emergencies. (R. 61). In fact, she stated they were the perfect job for a person with mental limitations who can only occasionally be around others. (R. 61).

As this review of the testimony demonstrates, the positions described by the VE do fit within the RFC limits found by the ALJ. Any "apparent" conflicts between the DOT requirements for the positions and Gautreau's RFC limits were adequately explained during her testimony. Accordingly, the ALJ did not err in relying upon it.

## V. RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the court GRANT the Commissioner's Motion for Summary Judgment (ECF No. 12), DENY Gautreau's Motion for Summary Judgment (ECF No. 10), and AFFIRM the decision of the Commissioner.

## VI.  **REVIEW PROCEDURE**

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.   Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.   A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2.   A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/

Douglas E. Miller
United States Magistrate Judge

February 26, 2016

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE